Good morning, Your Honor, and please, the Court. My name is Erwin Adler, and I represent Macy's. I believe the Court is—oh, I'm sorry, I didn't request the Court for four minutes of rebuttal time, if I may. Okay. Well, I'll try to remind you that you should watch your clock, and you really try to manage your time power. However, if you fail to do that, you'll get at least two minutes extra from me. Thank you very much, Your Honor. As I began a minute ago, I believe the Court is aware that this is a diversity case, and it focuses on an insufficiently tightened sprinkler head in a fire suppression system located in a Macy's warehouse in Arizona. At bottom, the tightening of that head never met either of the two standards that H&M was required to meet. First, the head wasn't tightened to the torque standards required by the manufacturer of the sprinkler head, and second, the sprinkler head wasn't—connection never met the governing standards established by the American Standards—American National Standards Institute. How do we know that H&M was required to meet those standards? Two reasons, Your Honor. Actually, there are three. First of all, under Arizona common law, Arizona requires a contractor to meet the standards in terms of a manufacturer. Common law cases indicate that you must meet manufacturer standards. In addition, the administrative code that regulates contractors in Arizona reaches the same conclusion. Third of all, it's in the contract between H&M and Macy's that they are going to meet all manufacturer specifications. As to the other issue, which is the American National Standards Institute standards, the—Arizona, as a matter of common law, again, requires all contractors to meet general and professional standards that are prevailing in the industry. How do we know those are prevailing in the industry? Yes, in the industry, and we're talking about pipe connections in terms of— Right. But how do we know? What's the evidence that those are the prevailing standards in the industry, since your expert, Mr. Crossen, doesn't know the industry? That is a shell game, Your Honor, which I will focus on in a second. In terms of the industry here is pipe connections. It's pipe—it is material deterioration and pipe connections. That's what we're talking about. That's what Crossen is an expert about. This is a—the standard for connecting pipe is the same standard that's used for connecting it. Pipe, if you do it yourself or doing it in your garage, if you're putting it in a school, if you're putting it in a shipboard or you're putting it in an office building, the same standards apply to all pipe connections. For example, in this particular case, we're dealing with one-inch pipes. The American National Standards Institute says for one-inch pipes, you're going to have to have 7.6 turns, four by .6 by hand and three by wrench. That is the standard that's applied. I think you're kind of missing my point, though. I want to ask you, let's suppose there are 100 different general contractors and 200 different fire installation contractors and none of them do what you think should have been done. None of them. How can we then conclude that the standard in the industry is what you suggested would be? If we can't conclude that, then what makes those standards applicable to those 100 companies that really don't comply with it as a matter of their general practice? As a matter of fact, they do. First of all, Crossen was of the opinion that they all do that because that is the standard practice. Beyond that... Excuse me, that's not my recollection of the record. I thought Crossen testified that he really doesn't know what the standard is for general contractors and fire installation contractors. He does know what the standards are for pipe connections. And in terms of this particular standard, the American National Standards B.1.2.0.1, that is a standard that was subscribed to by the association of which Mr. Communale, the president of the subcontractor here, was the president of the association which signed on to. That's the standard in the industry. Not only does the fire industry subscribe to that, the Army, the Navy, and every manufacturing association has subscribed to that standard. It's the same thing as, for example, wall plugs. When you look at a wall plug, they're all exactly the same size and shape. They may be manufactured by different people, different materials, and so on, but there are standards as to how those things are to be attached. And in the American National Standards Institute promulgation of this order, you see all of the various groups that have signed on to this. This isn't just somebody coming out with a standard. There are something like, I want to say, and I'm making this off the top of my head, that's approximately 40 or 50 organizations, including the fire alarm and sprinkler industry, who signed on to this. This is a standard in the trade. And I, at this point- Which trade is that? Which trade? This would be the entities which signed on to this. It would be the fire sprinkler association of the United States. All of these fire sprinkler companies belong to that because that's the one that sets the standards for them. If I don't believe we submitted as part of the records, because everybody agreed, including the expert for H&M here, and the expert for commonality of the subcontract, agreed that the standard was 7.6 turns, and that was set by ANSI standard. They're all familiar with it, and in fact, if you give me a second, I have the admission of the H&M expert who indicates that that is the standard for male fittings into female fittings on pipes, and for every other type of aspect that we're dealing with here. May I have a moment, your honor? Yes, you'll find it in the excerpts of record on page 166, lines 2 to 16, is the quotation from the H&M expert, and he answers yes to the following, and he says, and I'm quoting from the deposition, B1.20.1 governs all types of pipe connections involving a male and female threaded connection, whether it be sprinkler heads, pipes, or pipe nipples. Pipe nipples is the section that the sprinkler head is hooked into. So that we, H&M did not argue that that standard was not applicable in the industry. It is the standard in the industry. It's the standard for every construction job out there in the world that has one-inch pipes that requires these 7.6 turns. Can I ask about, how does that standard, you focused on the standard in the industry, but what about the contractual standard? It was different, and the district court said this isn't a breach of contract, it's a negligence claim, so it rejected that. Why would we look, if we found there's not enough evidence for the standard in the industry, or the expert wasn't qualified, why would we look to the contract? Well, in terms of the contract, we've got two things coming out of the contract. The tort of negligence is based on the contract, and in Arizona, as we pointed out, the... But no, the tort of negligence is not based on the contract. Breach of contract is based on the contract. Right, and the contract establishes a duty, and in Arizona, the courts have recognized that that duty that's established by contract can give rise to the standard of care. That's what we... We discussed the Rawlings case, we discussed the insurance company of North America case. But you didn't bring a breach of contract claim, right? No, we did not. So what... I guess I don't understand why you didn't. Why did you bring a breach of contract claim? The breach of contract claim could not have been brought because of the passage of the statute of limitations. Okay. We had no choice about that, and the negligence claim was... Well, but that, I mean, doesn't that undermine your argument? Because if the statute of limitations had run on the breach of contract, then really what you're trying to do is graft the contract terms into the negligence terms to circumvent the statute of limitations a bit. And it seems to me we're just stuck with one question, which is, is the standard in the industry, is there enough evidence to support that record? Well, in terms of we've got the admission of H&M's expert, that is the standard. I don't believe, because we had a... The excerpts were relatively modest considering the amount of paper that was filed in this case. I don't believe we filed a copy of the B1.201.1 standard, but it indicates on there that the I was just going to say, when you've concluded your answer to the last question, I'll have a question for you. Okay. Well, I think I relatively concluded that, that we have in a negligence claim, the negligence claim is based on a breach of duty, that duty in turn implements a standard of care that is supposed to be followed when you comply with that duty. In Arizona, as pointed out in our briefs, it is settled. Rawlings case settles it. The insurance company in North America and the other case we've cited in our brief indicate that if there's a breach of the duty, the standard of care can be established by the written contract. The Arizona Supreme Court adopted the Flint and Rawlings case, which it cites with great care in both of those decisions that I've mentioned. It's an Indiana Supreme Court decision, which is almost identical to the problem we have here, where there was a contract entered into to build a warehouse, build a barn. The contract had as one of its terms that the job was to be workmanlike. The barn fell down. The farmer then sued the contractor on the basis that the building was not constructed to workmanlike standards. And the court indicated that no, that was a basis for a negligence action and the negligence action was valid. That's the basis on which the Arizona Supreme Court used to state its holding in Rawlings. I hope that answers the question. And Judge Gould, you have a question. I do. I just want to make sure I understand the procedures here. My understanding was that this case did not go to trial and there was a summary judgment. That is absolutely correct. My other understanding is that your expert tried to put in an affidavit on the standard of care, but the district court did not want to consider your metallurgical expert because it viewed it wasn't an expert on the issues relevant here. No, I understand what the court is saying. And there is some confusion here. The district court took the position that even if Crossan was an expert on metallurgical failures, structural failures, pipes, and so on, that was irrelevant because he was not also an expert on general contracting practices. There are no general contracting practices in dispute in this case. That's not something that was alleged in the complaint. It's not been argued. No discovery has been taken on it. General contracting practices are not involved here. What is involved is the standard that applies to every connection, whether it's made on board a ship, a nuclear reactor, or in a warehouse. Crossan has done hundreds of these examinations, thousands of these examinations over the last 40 years, and he's testified about it. He's accredited by various institutions to deal with this. But the idea that he doesn't have additional expertise about general contracting practices is irrelevant. Or what's irrelevant is, does he have knowledge about the pipe connections? So if I understand this, your position is he should have been allowed to testify on the standard of care for this system and whether it was met, and that therefore there should have been a trial or other proceeding that went beyond the summary judgment. That is correct, your honor. If I may, I would like to turn that around a little bit. My position is exactly that, that he should have been allowed to testify as to the pipe connections. Since general contracting practices are not an issue here, that's irrelevant. If it turns out to be that this court concludes that we have to have somebody testify about general contracting practices, since that was never raised in the complaint, it was never alleged, there was no motion to dismiss filed on the basis that we had not talked about general contracting practices, then our position is that, again, the judgment should be reversed and we should have time to get an expert on general contracting practices if that's to be an issue in this proceeding. Did you ask the district court for the opportunity to file an amended complaint? To file an amended complaint, including that issue? No, we did not, your honor, but under this circuit's authority, we don't have to do that unless the trial court concludes, and I can give you the case citation in a moment, unless the district court concludes that there is no basis for a claim, and it would be futile to allow amendment, the district court on its own motion has to allow that amendment. The case would be Cook, Perkis, and Leahy versus Northern California Collection Service, 9-11, Fed 2nd, 242 at 247, and same conclusion in Lopez versus Smith, 203 Fed. Those were both attempts to amend after summary judgment had already been granted? No, those were the other way around, your honor. It was in those cases the court granted judgment, and this circuit reversed on the basis that the district court had failed to offer the opportunity to counsel to amend the complaint. But I mean below, it was after summary judgment, factual development. That's correct, your honor. So I hope that answers the question because I don't want to... Thanks, Scott. You've answered my questions, and I took you over your time. We'll give you an extra two minutes for a rebuttal argument. Fine, I'll do it in a rebuttal. We'll see what comes up here. Thank you, your honor. Okay, Mr. Giles, thank you for your patience, Scott. My pleasure. Thank you, your honor. May it please the court. What's really before the court is two issues. First, what is the standard of care that's at issue here? The second issue is where do you go to to look to the standards? What sort of standards do you find? The first question, what is the standard of care here? We're talking about the construction industry. This is a claim against a licensed professional who is in the business of doing construction. Whether you view it as a case against H&M in the first instance or H&M vicariously through Communal, the issue is what are the standards of care and who's qualified to talk about that? Your expert, we were just pointed to the excerpt of record 166, where as I read through it, your expert said, the standard of care is to look to the manufacturer installation structure. Would you agree with that? You're talking about Mr. Stremel, who's not a construction, and he's an engineer as well. I don't think he said what that is the standard of care in the industry. He did say what he did say is that is the standard that governs over the ANSI standard. The ANSI ASME standard that Mr. Allard talked about. How is that not the standard in the industry then? The manufacturer's instructions? Yeah. Well, I don't, first of all, because I think you need someone who can say that's the standard that you need to follow. And then I would follow that up, Judge Nielsen, with even if you assume that, okay, the manufacturer's instructions are the standard, there has been no evidence that that standard wasn't complied with. The standard is, and I'll read you the standard because I have it here somewhere. One second, bear with me. The standard is, and it's set forth in the excerpts of record, you can see it where I'm going to cite from is 260. It says wrench tighten the ESFR25, that's the sprinkler head, using only the W type one sprinkler wrench. And then plaintiff pulls out from a note that talks about that it should be, you should get a watertight connection if you're at 20 to 30 foot pounds of torque. Now, nobody has ever testified that the 20 to 30 foot pounds of torque was not met. Nobody has testified that it was either. But that is the issue here. Right. But that's their duty to, before the contested material fact or certificate from the judge. Correct. So even if we assume that what Mr. Stroml is saying establishes the standard of care for a contractor that's installing a fire sprinkler system in a large warehouse, then we still get to the same result because there has been no evidence whatsoever that that manufacturing standard was not met. Unless your evidence is that it leaked. So therefore it's not. And I don't think that's evidence without something to show that it wasn't within those standards. We're talking about seven or eight years after the installation is complete when this incident happens. What about Mr. Adler's point that there is a set of standards that Communal had signed onto as a fire installer company, and that those are the standards that were breached. Isn't that part of the duty of care? Your Honor, respectfully, I do not think it's the duty of care. And the reason that I say that is because you need to have someone who is actually in the construction industry. Communal is a member of that, certainly. Or at least arguably, I haven't seen anything for Mr. Communal saying that, but I've seen indications that he might be. However, that does not say that as it relates to the construction industry, that ANSI-ASME standard is the standard of care that applies to a contractor who's installing those things. Does the jury really need an expert to tell it that if a company signs on to a set of industry standards, those are the applicable standards? Well, I would say yes, Your Honor, in this case, particularly because those ANSI-ASME standards are manufacturing type standards. And what Mr. Sturml talked about in his deposition testimony was that when a manufacturer gives you instructions on how to do something, they take into account those manufacturing standards such as the ANSI-ASME standards. And so as a result, we need to look to something other than the ANSI-ASME standards. There needs to be evidence. Mr. Adler wants to call this industry the pipe connection industry. That is not who the claims are against in this case, Your Honor. The claims in this case are against my client who is a licensed general contractor in the state of Arizona. And the industry that we're talking about is the construction industry. And as we've talked about already, Mr. Sturml, excuse me, Mr. Crossan admitted that he's not experienced in that field. Certainly, he's a medical or metallurgical engineer with some qualifications to talk about causation or structural failures, but that does not make him qualified to talk about the standard of care that applies to a general contractor or a fire sprinkler contractor who's licensed in the state of Arizona. Those standards may or may not apply. And you need someone who's actually in that industry who can address what those standards are and whether the ANSI-ASME standards apply in this case. Was there evidence in the record that, assuming we were to give credibility to the expert in his testimony, was there evidence in the record or disputed fact that that standard was not applied? That the ANSI-ASME standard was not complied with? Yes. Is that the standard you're talking about? I think so. The set, the four turns by wrench of the three. Yeah, the industry standard. Yes, Your Honor, there was testimony from the experts, from both. That that was not complied with. Sorry, that that was not complied with? Yeah. Yes, I think that's what Mr. Crossan said, that that ANSI-ASME standard was not complied with. Okay. So the second issue we need to get to is, if those standards apply, what are the standards and who dictates what those standards are? And as I've talked about already, it is our position that it is a licensed general contractor or a sprinkler construction installer who's licensed and knows that industry who needs to address those. Mr. Adler talked a little bit about administrative regulations and there is, in the contract, there's the workmanlike standard. You have to do the work in a workmanlike manner standard. That is a standard that Arizona courts have adopted. But the issue that we have here is that standard has absolutely no meaning without someone who can talk to us about what that means in the construction industry. What is the workmanlike manner? And this is not a generally, the ANSI-ASME standard is not a generally applicable standard that if you or I were in our home and we were installing a sprinkler and we didn't do it, we would therefore be negligent, which is what Mr. Adler seems to be arguing. You need to have someone who actually is in the construction industry who can talk about that standard because what we're talking about is the work of a licensed professional. It's not as if this is a car accident case where any lay juror will be able to understand what the issues are and whether or not somebody acted properly. This is one that needs a qualified expert. And Mr. Croson may be qualified in many areas, but he is not qualified by his own admission to address those specific areas. What about Mr. Adler's point that if the district court was going to accept your argument on as it did, it was required to sui sponte, give him the opportunity to go out and find an expert that could cure that gap in the record that the district court relied on. And he cited us to a couple of cases, which I haven't read yet. Your Honor, I would disagree with that, that the district court has a sui sponte. We were at the point in the case where discovery was completed. The opportunity to amend complaints had long since expired. We were done with discovery by the court's order. The court had not allowed any additional time for discovery. And the case was ready to go to trial. I don't think there's anything in those cases that says now, after the fact, after discovery has ended, procedurally ended, and the only step left is the submission of dispositive motions and any motions related to the actual trial and the witnesses, that now we have to go back and say, oh, well, I'm sorry. I didn't realize that that issue was. And I would also point out to you that that issue was raised by both H&M Construction and H&M Architects, who at the outset of the case asked to have it dismissed because plaintiff did not have the required expert. It's required in Arizona under ARS 12-2602. So the requirement and the issue that plaintiff needed a standard of care expert qualified to talk about the construction industry had been raised at least since that time. It was not a new issue. Can I ask, just assuming, hypothetically, that we were to reverse on the grant of summary judgment, is it your position that we should go in and reach the vicarious liability and the economic loss doctrine on appeal, even though the district court did not address that, or should we remand that for the district court to review those in the first instance? It's a very good question, Judge Nelson. And I think because the district court did not ever really address it, probably if you reach that, the better instance would be to remand to the district court for them to consider that specific issue. It talked about it peripherally, but I don't think ever reached it. Those would be alternative bases for your client to prevail on summary judgment. Is that right? Yes, that would be an alternative basis to prevail. Yes. But I don't think we need to get there. And the reason is because there has been no evidence that either the general contractor or the vicarious liability. I understand your position. And I think that's what the district court said. And that's why. But yes, I do agree with you. That would be an alternative basis is to remand and have the district court considers that specific issue and the applicability of the economic loss rule. I'm not going to talk about the vicarious liability issue unless you want me to, because I don't think that's really what is raised on the appeal. But what I want to emphasize to you is Arizona has very specific laws. ARS 12-2602 very clearly talks about the need and in multiple Arizona cases, which are cited in our brief, talk about the need for someone who is actually qualified in that industry. It is not a new issue. It's not something that was hidden or concealed. It is all over Arizona law. When you are bringing a claim against a licensed professional who is acting in the course and scope of that professional license, you need somebody who is qualified. And it's a little different in this context. With a medical doctor, you need a specialist. In this context, I think you could have had any contractor, whether it was a general contractor or a fire sprinkler contractor, somebody who has some knowledge about the construction industry and can talk about what is the standard of care in the construction industry, because that is what is at issue. It is not the pipe fitting industry. It is the construction industry and the installation of fire sprinklers by a licensed contractor. If we're talking about the other standard, the manufacturing standard, I've talked a little bit about the lack of any evidence that that standard was not complied with. The other standard, the workmanlike standard, comes from a multitude of cases, but the most significant one is probably the J.W. Hancock case that was cited in Mr. Adler's briefs. That one says, you talk about the workmanlike standard as established usage, procedure, and acceptable industry practices prevailing when the work was performed. We don't have anything for you guys to overturn in this case because there is nobody who was qualified that Plantev offered to talk about what the industry norms are in this case. I don't think I have anything else for you. Unless any of you have questions, I will submit to you. I have no questions myself. I thank you for your argument. In that case, I guess it's my turn to deal with a rebuttal and to deal with a few separate and discrete items here. In terms of whether this particular fitting met the standards, we have in the appendix, I don't know if this shows up or can show up on the screen there, but you see what the head looked like, the sprinkler head looks like. The sprinkler head only had four turns. There were never 7.6 turns on here. This is on page 393 of the excerpts of record, and you can see how the head fits into the pipe fitting on 397. And it is fairly clear that this thing was simply turned into the fitting by hand and never tightened down with a wrench. Mr. Edler, with all respect, I think that kind of begs the question, even if we assume that to be the case, those are manufacturer standards, and somehow the court needed to know that a general contractor is supposed to comply with those standards. Well, I take it back to, again, there are two things. There are manufacturer standards, and there's the ANSI standard. The manufacturer standard required there to be at least a minimum of 20 torque pounds of pressure and a maximum of 30. I have with me the kind of wrench that was used in that, and this is the wrench that all of the defense experts looked at. The question to me that's important to me is, was there evidence that it was not brought to 20 to 30 pounds of torque pressure? There was in the following sense. Across and testified very clearly it had to be between the 20 and 30 pound pressure. If it was between 20 and 30 torque pounds of pressure, the linkage could not have leaked under Tyco's standards. If it leaked by hypothesis, it had to have not met that standard. In order to, and the manufacturer standard is a pressure standard. In other words, you're testing it with torque. This type of wrench, which is the only wrench that H&M used, and this was shown a deposition to all of the defense experts, does not have a torque measurement on it. Every one of the defense experts, and we have it in the brief, so I can quote that if the court would desire me to do so. Every one of the defense experts said, with this kind of a wrench, you can't test what the torque is. Nobody knows what the torque is on this type of a wrench because there's no feature like a torque wrench. Therefore, you can't prove your case because you have no idea whether it was under 20 to 30 pounds of pressure. We do have the inference that an expert like Mr. Croson can say it could not have been because it leaked. And we also have the ANSI standard where the ANSI standard requires 7.6 turns. And from those two photographs I just mentioned a moment ago, one of which I showed, shows that it was only turned four times. In other words, it was turned in by hand and nobody wrenched it. The ANSI standard is somewhat different because that's a visual standard. So your man can turn this thing around and he can see that he's done it 7.6 times. That never happened here. And what we're talking about is the pipe connection. There is nothing that I know of and none of the experts, and there's no evidence in the record that says the construction industry, any more than the nuclear power industry, than the shipboard building, shipbuilding, any other industry is exempt from the standard. A one-inch pipe on each one of these engineers testified to has to be turned under the ANSI standard 7.6 times. And if you're using a Tyco sprinkler head, it has to go between the 20 and 30 pounds of torque. So it is, it's kind of fundamental. There is no exception for the construction industry. And we turn to the status of experts here. And when we're talking about medical experts, under Ninth Circuit case law, the experts do not have to have the exact subspecialty that we're talking about. You have a surgeon can testify about heart surgery, even if he is not a specialist in heart surgery. In terms of the brief, we cited those cases. Counsel, we're definitely aware of the briefing, but I think your time is over beyond the time I extended. Your Honor, I appreciate the courtesy of giving me the extension of time. I try to answer the questions as best I could. And if I spent too much time, I apologize for that. You know, you didn't spend too much time. And, you know, we kept you busy with questions. I have a final question for both of the excellent advocates here. And that question is, I wanted to know if you had both explored mediation under the Ninth Circuit's mediation program. Your Honor, we have. The H&M people are not particularly interested in settling the case. I would disagree with that characterization, but we definitely have participated in the mediation process, both pre-Ninth Circuit and with the Ninth Circuit. Yeah, I was really just talking about the Ninth Circuit. Yes, we did. The district courts are a little different organization. But thanks. That's what I wanted to know. Great. I think unless there are questions from Judge Kogan or Judge Nelson. If you could indulge me, Judge Gould, I'd appreciate it. I have one more thing that's bothering me. You know, in this case, I'll read the cases you cited, Mr. Adler, about how the district court ought to give this opportunity to amend by itself. I'm a little skeptical about that. But in this case, particularly, didn't the district court give you a tentative ruling saying we don't think your experts in the right industry and your clients still didn't ask for an opportunity to come up with the right expert? No, that was not what the tentative ruling was about. The tentative ruling was about the legal standard as to whether the standard of care could be inferred from the terms of a contract. There was no discussion that I recall, I may be incorrect, but there's no discussion that I recall about whether we should be retaining another expert on the construction matter. I appreciate that. I just wanted that clarification. If I may make one more comment to just make sure that I've made myself clear, Judge Kogan. The, had we been put in the position of knowing that a construction expert would be necessary, as we pointed out to the circuit in our opening brief, if that turns out to be what this court finds is necessary in these types of cases, we're perfectly happy to go out and get an expert. We didn't realize that that was going to be necessary because the case law to us appears clearly to the contrary. Thank you, counsel. I think, let me just make one comment for me as a single judge. If we, if the court were to send the parties like a notice that they could consider mediation, I don't want you to respond either of you now to that. But if we did, I wanted you to know that that type of notice leaves the matter entirely voluntary, that we won't, nothing will be mediated unless both parties wanted to mediate and further, we would not know if a particular party declined because the way our procedures work, the circuit mediator would contact both of you. And then if either party didn't want to mediate, would alert us it wasn't going to be mediated without advising of the position of any party. Okay. So we'll now submit this Macy's case. Thank you, your honor. Thank you, your honor.
judges: Gould, Cogan, Nelson